KESHIA ADENIYI (SBN 291685)
JANVE SOBERS (SBN 355575)
**K. ADENIYI LAW, APC**
18650 MacArthur Blvd., Ste. 300
Irvine, California 92612
T: (949) 209-5033
F: (949) 202-5997
E: admin@kadeniyilaw.com

ROBERT R. POWELL (SBN 159747)
**POWELL & ASSOCIATES**
925 West Hedding Street
San Jose, California 95126
T: 408-553-0201 F: 408-553-0203
E: rpowell@rrpassociates.com

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM LOPEZ, ELIZABETH LOPEZ, E.L, minor, by and through Guardian ad Litem<br><br>*Plaintiffs,*<br><br>vs.<br><br>COUNTY OF KERN, LABRAIEL ROBERTS, JENNIFER ALDACO, KAREN SANTIAGO, REBECA MONTOYA, ROSA HERNANDEZ, KAISER PERMANENTE LOS ANGELES MEDICAL CENTER, GISELLE LEON, DR. ASIT VORA, DR. KEVIN CHANG, JACQUELINE PACHON, and DOES 1 through 10.<br><br>*Defendants.* | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>**First Claim for Relief:** Violation of Civil Rights (42 U.S.C. § 1983) – Fourteenth Amendment – Familial Association<br><br>**Second Claim for Relief:** Violation of Civil Rights (42 U.S.C. § 1983) – Fourth Amendment – Unlawful Seizure<br><br>**DEMAND FOR JURY TRIAL** |

### Jurisdiction and Venue

1. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3), (4), as this civil action poses a federal question, seeking redress under 42 U.S.C. § 1983 for

1

deprivation of rights secured by the United States Constitution.

2. At all times relevant to this Complaint, Plaintiffs were residents of Kern County, California.

3. The acts, failures to act, and omissions complained of herein occurred in the County of Kern, and one or more Defendants are residents of the County of Kern. Venue is proper in the Eastern District Court of California.

4. Plaintiff makes the following allegations and claims upon personal knowledge, and/or on information and belief.

**The Parties**

5. At all times relevant to this Complaint, Plaintiff E.L. was a minor child, and a resident of Kern County, California.  E.L. was the natural born child of Plaintiffs Sam Lopez ("Sam") and Elizabeth Lopez ("Elizabeth").

6. At all times relevant to this Complaint, Plaintiff Sam Lopez ("Sam") was a resident of Kern County, California, and the natural and lawful father of E.L.

7. At all times relevant to this Complaint, Plaintiff Elizabeth Lopez ("Elizabeth") was a resident of Kern County, California, and the natural and lawful mother of E.L.

8. Plaintiff Elizabeth Lopez will seek appointment as Guardian Ad Litem for the minor child at or near the time of filing this Complaint.

9. Defendant COUNTY OF KERN ("COUNTY") is a public entity of which the Kern County DEPARTMENT OF HUMAN SERVICES ("DHS") is a subdivision. DHS and COUNTY may be used interchangeably below, but all claims regarding liability are as an against COUNTY.

10. At all times relevant to this Complaint, Defendant DHS County Social Worker ("CSW"), LABRAIEL ROBERTS ("ROBERTS"), was an individual residing in the County of Kern and an officer, agent, and/or employee of the COUNTY and DHS. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein.

11. At all times relevant to this Complaint, Defendant DHS County Social Worker ("CSW"), JENNIFER ALDACO ("ALDACO"), was an individual residing in the County of Kern and an officer, agent, and/or employee of the COUNTY and DHS. At all relevant times alleged herein, she was acting under color of law in taking the actions, and/or failing to take the actions alleged herein.

12. At all times relevant to this Complaint, Defendant DHS County Social Worker ("CSW"), KAREN AVILA SANTIAGO ("SANTIAGO"), was an individual residing in the County of Kern and an officer, agent, and/or employee of COUNTY and DHS. At all relevant times alleged herein, she was acting under color of law in taking the actions, and/or failing to take the actions alleged herein.

13. At all times relevant to this Complaint, Defendant DHS County Social Worker ("CSW"), REBECA MONTOYA ("MONTOYA"), was an individual residing in the County of Kern and an officer, agent, and/or employee of COUNTY and DHS. At all relevant times alleged herein, she was acting under color of law in taking the actions, and/or failing to take the actions alleged herein.

14. At all times relevant to this Complaint, Defendant DHS Public Health Nurse, ROSA HERNANDEZ ("HERNANDEZ"), was an individual residing in the County of Kern and an officer, agent, and/or employee of COUNTY and DHS. At all relevant times alleged herein, she was acting under color of law in taking the actions, and/or failing to take the actions alleged herein.

15. KAISER PERMANENTE LOS ANGELES MEDICAL CENTER ("LAMC") is a hospital and medical facility operating in Los Angeles County.

16. At all times relevant to this Complaint, LAMC employee and Pediatric Medical Doctor, Dr. ASIT VORA ("Dr. VORA"), was an individual residing in the County of Los Angeles and an officer, agent, and/or employee of LAMC.

17. At all times relevant to this Complaint, Pediatric Social Worker and Defendant GISELLE LEON ("LEON"), was an individual residing in the County of Los Angeles and an officer, agent, and/or employee of LAMC.

18. At all times relevant to this Complaint Pediatric Medical Doctor and Defendant DR. KEVIN CHANG ("Dr. CHANG"), was an individual residing in the County of Los Angeles and an officer, agent, and/or employee of LAMC.

19. At all times relevant to this Complaint, Pediatric Medical Doctor and Defendant DR. JACQUELINE PACHON ("Dr. PACHON"), was an individual residing in the County of Los Angeles and an officer, agent, and/or employee of LAMC.

20. Plaintiffs are ignorant of the true names and capacities of those other COUNTY and/or LAMC Defendants sued herein as Defendant DOES 1 through 10, and for that reason has sued such Defendants under such fictitious names.

21. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE Defendants when their identities have been ascertained.

22. Each of the fictitiously named individual DOE Defendants was and is in some manner, liable and legally responsible for the harms sustained by Plaintiffs alleged hereinbelow in that the individual DOE Defendants' conduct violated the familial association rights of E.L., Sam, and Elizabeth and caused the damages and injuries set forth herein, and were either 1) the decision makers and/or integral participants in the decision to keep E.L. in the LAMC after it was unquestionably clear the injuries to E.L.'s head were the result of an accident, and E.L. had no broken bones whatsoever and yet continued to detain E.L. from his parents, or, 2) were the decision makers and/or integral participants in an effort to justify the obtaining of a warrant to take physical and legal custody of E.L, or, 3) were in a role that required their ratification, approval or authorization for the other individually named Doe Defendants or others, to take the actions and/or fail to take the actions complained of in this Complaint.

23. Alternatively, Plaintiffs allege that the individual Doe Defendants by ratifying the alleged conduct of the individual Defendants, did through their ratification, approval or vested power and/or routine authorization, in fact give to the subordinates and/or other named individual Defendants the clearance to continue the detention of E.L. without lawful authority of any kind.

24. Whenever this Complaint makes reference to any act of Defendants, such allegations shall be deemed to mean all named Defendants, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants (or any of them) and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

25. At all times relevant to this Complaint, all Defendants were the knowing employees, agents, and/or alter egos of one another and were acting within the course and scope of their duties in such capacity.

26. The individual Defendants and each of them, integrally participated in the decisions made which led to the unlawful detention of E.L. at LAMC, as described hereinbelow and/or directed, ratified, and/or approved each other Defendant's conduct or failures to act, and that of each other's agents or employees. Defendants and each of them, agreed upon, approved, or ratified each other's conduct or failure to act reasonably, competently, and legally, or otherwise conspired together to commit all of the acts and/or omissions alleged herein.

27. In reaching the agreements amongst themselves to unlawfully continue the detention of E.L., two or more of the Defendants agreed to act together to not advise the parents of E.L. of the fact the apparent injuries to E.L. were not in fact injuries at all, and had a meeting of the minds on the decision to not release E.L. to the child's parents, out of some baseless concern born of no "evidence" at all.  In doing so they were agreeing and

conspiring to deprive the plaintiffs of their Constitutionally guaranteed right of familial association, which caused all Plaintiffs significant emotional damages.

*Other Persons of Note*

28. E.L.'s 15-year-old sibling, N.L., who accidentally dropped E.L. from his car seat and caused the skull fractures.

29. Kaiser employee and Pediatric Radiologist, Dr. GARY RADNER ("Dr. RADNER"), who conducted the March 26, 2024, and April 27, 2024, full-body-X-Ray/skeletal surveys.

30. Kaiser employee and Child Advocacy Attending Dr. WAN-KEUNG CHEN ("Dr. CHEN") who examined E.L. on April 27, 2024.

31. Kaiser employee and Pediatric Medical Doctor

32. Kaiser employee "Daniel"

33. DR. TINA HARDLEY ("Dr. HARDLEY"), who examined E.L. on March 24, 2024.

## COMMON ALLEGATIONS

*Accident and Hospitalization on March 22, 2024.*

1. On March 22, 2024, Elizabeth unbuckled 34-day-old E.L. from his car seat after arriving home from a shopping trip and instructed her teenage daughter, N.L., E.L.'s older sibling, to take E.L out of the car.

2. N.L. was unaware that Elizabeth had unbuckled E.L., and attempted to lift the entire car seat out of the car.

3. Unfortunately, when N.L. pulled the car seat from the car, because he was unbuckled, E.L. fell from his car seat on to the cement garage floor. E.L. fell from a height of three to four feet out of the car seat N.L was holding.

4. Elizabeth and Sam's other children who were present immediately rushed to a neighbor's house who happened to be a registered nurse, to ask for first aid assistance.

5. Sam was at work at the time of the accident.

6. Elizabeth called 911 immediately, and an EMS ambulance arrived in under 10 minutes.

7. EMS initially transported E.L. and Elizabeth to Bakersfield Memorial Hospital. Upon arrival, E.L. was then immediately transferred to LAMC because he was in need of a higher level of care than Bakersfield Memorial could provide. E.L. was admitted to LAMC by Dr. CHANG on March 23, 2024.[1]

8. Dr. CHANG ordered imaging that revealed what appeared to be bilateral fractures to E.L.'s skull without any intercranial bleeding associated.

9. As a result of Dr. CHANG's conclusion(s), E.L. was admitted for continued observation and imaging due to his young age.

10. Due to the skull fractures and the child's young age, a Suspected Child Abuse Report (SCAR report) was completed and DHS and law enforcement were notified.

***DHS Involvement with the Family—March 23, 2024***

11. On March 23, 2024, COUNTY received an emergency referral regarding E.L.'s fall and subsequent head injury.

12. Law enforcement had already investigated this same referral, interviewing the family and their neighbors, and concluded the incident was accidental.

13. As a result of the law enforcement investigation concluding the injury was accidental, on the same day an unnamed DHS agent spoke to the anonymous reporting party  and closed the DHS referral with a finding of "inconclusive"

14. The very first full body X-Ray/skeletal survey was conducted on E.L. on March 23, 2024 which appeared to show bilateral symmetrical fractures in E.L.'s  right and left femurs and in the child's left and right tibias. The parent's consented to the first full skeletal survey because they wanted to make sure he did not suffer any other injuries when he was accidentally dropped.

---

[1] E.L. was initially supposed to be transferred to Valley Children's Hospital in Madera, California, however Kaiser wouldn't approve the

15. On March 23, 2024, Dr. HARDLEY reviewed the X-Ray skeletal survey and concluded the findings were suspicious for abuse.

16. The findings of fractures in E.L.'s femurs and tibias were not disclosed to the parents at the time, or near the time, that Dr. HARDLEY concluded the findings were suspicious for abuse. Dr. HARDLEY did not, however, make any finding that the injuries were caused by either parent.

17. Despite the absence of any evidence that E.L.'s injuries were caused by abuse by either parent, LAMC Social Worker Leon reported to DHS that "they" at LAMC were "concerned" about a risk of further harm and, based on that asserted concern, decided not to inform the parents of the fractures.

18. On March 24, 2024, new referral was made that included the alleged leg fractures. Social Worker ROBERTS contacted the reporting party at LAMC, who stated that fractures had been identified in each of E.L.'s legs and further asserted—without evidentiary support—that the injuries were in varying stages of healing.

19. The reporting party also indicated that further testing was needed to rule out issues like low bone density. The reporting party further indicated that  E.L. could be discharged as early as the following day March 25, 2024.

20. Elizabeth first heard of the alleged leg fractures when Social Worker SANTIAGO interviewed her and inquired about possible causes of the fractures that same day.

21. Elizabeth, having no knowledge of how any fractures could have occurred, expressed confusion and denied that any accidental injuries had taken place.

22. Also on March 24, social worker ROBERTS spoke with law enforcement who informed her that the witness statements were all consistent regarding the accidental nature of E.L.'s fall and injury, and that no criminal action would be taken.

23. ROBERTS informed law enforcement of the reported leg fractures.

24. On the same day, social worker ROBERTS conducted interviews with E.L.'s siblings. Notably, all five children resided in the home with the baby brother E.L. and their parents

Sam and Elizabeth.

25. ROBERTS noted that none of the children displayed any visible indications of abuse or neglect, nor did they disclose any concerns regarding the parents.

26. The children also further corroborated Elizabeth's account of E.L.'s fall to ROBERTS.

27. On March 25, 2024, Social Worker SANTIAGO was contacted by LAMC Social Worker LEON. LEON reported that the child's condition was stable and that his injuries were extensive and suspicious of abuse.

28. LEON stated that further testing was pending but if the child remained stable, he would be discharged the following day.

29. LEON indicated that X-Ray imaging revealed healing fractures on each of the child's femurs and a fracture in the right tibia.

30. LEON inquired about the County placing an investigative hold on the child.

31. SANTIAGO also spoke with Dr. PACHON and Dr. CHANG on March 25.

32. Dr. CHANG indicated that the injury to the right tibia was estimated to be 5 days old, but that further imaging and orthopedic consult had been ordered.

33. Dr. CHANG further told SANTIAGO that a pediatric radiologist might be better equipped to answer questions regarding the child's condition.

34.  SANTIAGO informed the hospital staff, including LEON, that there was no investigative hold on the child at that time as the County was still evaluating the referral.

### E.L. Placed on Illegal Hospital Hold After First Skeletal Survey

35. On March 26, 2024, DHS Social Worker SANTIAGO spoke to LEON to discuss E.L.'s medical progress. LEON explained that the Kaiser medical team had ordered the genetic testing to assess for bone density disorders as a possible explanation for the fractures. The results of this testing was still pending, but LEON indicated that as soon as the testing was completed E.L. would be cleared for discharge.

36. Later the same day, a conference call took place between LEON, Dr. VORA, CSW, and DHS Public Health Nurse HERNANDEZ.

37. The group discussed E.L.'s alleged injuries. Dr. VORA made note of the fact there had been a discussion of the possibility that E.L.'s injuries stemmed from a genetic bone disease.

38. HERNANDEZ inquired with Dr. VORA about follow up testing and Dr. VORA agreed that the child should be referred for follow up due to needing an additional skeletal survey in two weeks.

39. On the same day, SANTIAGO called Elizabeth to inquire about E.L.'s injuries and allegations. Elizabeth denied any incident occurring that could have caused the injuries as described by Dr. VORA to the child's lower extremities.

40. SANTIAGO then followed up with LEON and Dr. VORA to inquire further about E.L.'s injuries.

41. LEON explained to SANTIAGO that the "medical team" had not discharged E.L. yet, saying the "medical team" did not do so due to not feeling comfortable sending him home with his parents for fear of further abuse or death.

42. Plaintiffs are informed and believe, and thereon allege, that the "medical team" that LEON was referring to when referencing the decision to not discharge E.L. to the child's parents, included but was not limited to, LEON, Dr. VORA, Dr. CHANG, Dr. PACHON, and Dr. HARDLEY, and that all of these Defendants were integral participants in the decision to withhold custody of E.L. from her parents, despite their absolute absence of authority to do so under any State or Federal law, and despite the fact there was no medical basis for E.L. to remain in the hospital.

43. Dr. VORA further speculated that the family's explanation of E.L.'s 's head injuries could not account for the positioning of the fractures he observed in the imaging.

44. Dr. VORA's opinion in this regard was remarkable, given no one, including N.L. who had "dropped" E.L., could explain or did explain exactly how it was that E.L. came out of the car seat and hit the garage floor.

45. Dr. VORA expressed concern with E.L. being discharged to his parents and stated that he

10

did not feel comfortable signing the discharge at that point.

46. Plaintiffs are informed and believe that unknown Doe Defendants 1 through 3 were informed that Dr. VORA was refusing to discharge E.L. and knowingly ratified that decision, as well as the "medical team's" decision to withhold E.L. from his parents.

47. On a date unknown Elizabeth and Sam spoke with an unknown doctor and DHS social worker SANTIAGO regarding the results of the first skeletal survey performed on E.L.

48. Dr. CHANG and DHS social worker SANTIAGO explained to Elizabeth and Sam that the findings from the initial skeletal survey could appear to be fractures but that a second skeletal survey could reveal different findings that could ultimately rule out abuse. They further advised Elizabeth and Sam not to worry pending the results of the follow-up skeletal examination.

49. The hospital unlawfully seized E.L. for at least two days beyond his original estimated discharge date of March 25th. The hospital failed to notify DHS or E.L.'s parents of their findings, and E.L. continued to be placed on a hospital hold at the direction of DHS.

50. However, on March 27, 2024, *prior* to E.L.'s discharge, another skeletal exam was conducted and reviewed by Dr. RADNER. Notably, Dr. RADNER, reported that the irregularities observed in the X-Ray of E.L.'s lower extremities could be related to previous trauma although a nontraumatic developmental condition known as a "bone collar" may also appear as symmetrical fractures.

51. Consequently, Dr. RADNER recommended follow-up imaging, which would reveal whether the irregularity in the X-Ray is a fracture or a nontraumatic developmental condition.

52. Dr. RADNER's review of the X-Ray conducted March 27, 2024, revealed no fractures at all in the E.L.'s 's tibias, whereas the first X-Ray, conducted only four days prior, revealed fractures on his tibias which Dr. CHANG had estimated to be just five days old at that point.

53. Dr. RADNER's report stated with clarity that the imaging results of E.L.'s femurs and

tibia were consistent with "physiological periostitis" a.k.a. a bone collar, and in fact E.L. did not have any bone fractures in the legs at all.

54. Neither DHS nor KAISER made note of these findings from Dr. RADNER in any official document; it was not to be found in the documents the parents picked up from LAMC, nor in the reports by DHS social workers.

***E.L. Detained on March 27, 2024, Petition Filed Alleges Serious Physical Abuse***

55. On March 27, 2024, E.L. was finally discharged to DHS instead of his parents. In the final discharge note, Dr. PACHON notes the need to repeat the skeletal survey at two weeks but fails to make note of the new findings in Dr. RADNER's radiology report

56. Social worker SANTIAGO advised Elizabeth that E.L. was going to be removed from them. This was the first time Elizabeth was informed that she was being investigated for child abuse.

57. Social worker SANTIAGO asked Elizabeth if she knew that E.L. had broken hands and broken legs. Elizabeth immediately started crying asking SANTIAGO how he got broken hands. She repeatedly told SANTIAGO "we didn't break our baby!"

58. Elizabeth called Sam who was at work. Sam in shock and disbelief contacted the social worker to figure out what his wife was upset about.

59. SANTIAGO explained the situation and reiterated that E.L. was going to be picked up from the hospital and taken away from the parents. Upon advice of counsel, Sam asked for a warrant.

60. SANTIAGO arrogantly and coldly advised him that she was not "required" to show them a warrant and E.L. would be picked up from the hospital and placed in DHS custody.

61. E.L.'s parents were thrown into complete shock. They believed their child was receiving care and recovering in the hospital; instead, they were subjected to an investigation, and their child was being held pending transfer to DHS.

62. In the final discharge note, Dr. PACHON notes the need to repeat the skeletal survey at two weeks but fails to make note of the new findings in Dr. RADNER's radiology report.

63. Sam headed to the hospital to meet Elizabeth  and get more information. Their sister, Blanca Navarette also came to the hospital.

64. Blanca demanded to see the Xrays and was advised that they were not allowed to show them to the family. The family insisted and looked at the xrays.

65. Sam told the "medical team" the entire time "this is wrong!"

**Sam and Elizabeth continued denied access to the juvenile court file**

66. At the initial hearing in the juvenile dependency court on March 29, 2024, Sam made a further request for the warrant and warrant application in court.

67. Despite this being an official document in a legal proceeding, in which allegations were made about Sam and/or Elizabeth, the judge told the Lopez's that they would have to file a formal request with DHS to obtain the warrant and application that authorized their son's removal.

68. After the initial hearing, Elizabeth attempted to obtain the documents in her file from the DHS office. She was told no documents were contained in her file.

69. Sam and Elizabeth made a second attempt to get a copy of the warrant and warrant application leading to removal of their child, by going directly to the DHS office.

70. This time Sam was able to retrieve documents from his file, but the Warrant Application was not in his file. Sam was also advised that he was not permitted to discuss or make any copies of the documents in his file.

71. The Petition filed against E.L.'s parents alleged injuries falling within W&IC § 300(a) and (e)--among the most serious provisions, as they imply intentional harm to a child.

72. The Petition alleged the following against both parents: that E.L.

> "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted non-accidentally upon the child" by his parents. "On March 22, 2024, the child sustained bilateral parietal skull fractures, femur fractures in both thighs, and a tibia fracture in the left shin. On March 24, 2024, medical staff identified a healing injury on the child's right tibia, estimated to be 1 to 2 weeks old. The child's injuries are considered non-accidental trauma suspicious of abuse by the child's pediatric attending doctor."

73. These allegations failed to reflect that law enforcement and DHS had evaluated out the head-injury allegation due to the fact the multiple witnesses saw the accidental fall that caused the injury.

74. These allegations omitted that the radiologist—the only physician to interpret E.L.'s leg imaging, Dr. RADNER—concluded that the findings in the femurs and tibias were consistent with a known condition referred to as a "bone collar." This omission is especially significant given that Dr. CHANG had already admitted to DHS Social Worker SANTIAGO that the alleged fractures could not be accurately assessed without a radiologist's interpretation.

***Third Skeletal Survey Reveals No Fracture and DHS Fails to Return E.L. to Care of Plaintiff for Three Months Despite New Evidence***

75. After a month in DHS custody, on April 26, 2024, Kaiser finally conducted a subsequent skeletal survey, long after the 14-day window ordered by the emergency medical team on or about May 24, 2024.

76. This appointment was scheduled by DHS and social worker ALDACO notified the caregiver of the time, date, location, and purpose of the visit via text message, including that there would be a Skeletal Survey/X-Ray.

77. The skeletal survey was reviewed by the same radiologist, Dr. RADNER, who reviewed the March 27th survey. Dr. RADNER compared the two X-Rays which continued to reveal an absence of reactive healing changes consistent with "bone collars."

78. Moreover, attending physician Dr. CHEN indicated in his visit summary that both the initial imaging and the follow up imaging showing the skeletal abnormalities are consistent with "bone collar" and confirmed that it is entirely plausible that the skull fractures occurred as a result of the accidental trauma reported.

79. The caregiver, Maira Franco, Elizabeth's sister was present during the IMRI and skeletal survey and was told that the imaging did not reveal any fractures.

80. Shortly thereafter DHS social worker, REBECCA MONTOYA went to Maira's house to

14

supervise a visit between E.L., Elizabeth and Sam. During the visit Maira updated MONTOYA concerning E.L.'s, medical appointment and advised MONTOYA that Daniel from the "medical team" had informed her that the doctor could not find any fractures when she inquired about why they were doing so many x-rays on E.L. MONTOYA looked surprised and Maira advised her to get the medical records.

81. Sam and Elizabeth obtained a copy of their medical records which confirmed the results of E.L.'s skeletal survey conducted on April 26, 2024.

82. On or about May 9, 2024 Elizabeth notified ALDACO and MONTOYA and advised them about the results of the survey. Elizabeth sent them a copy and MONTOYA and ALDACO told her they would review them.

83. On May 23, 2024 ALDACO confirmed that she too received the medical records, however, CSW failed to immediately notify the Court regarding the confirmation that E.L. was not abused by his parents.

84. On June 6, 2024, E.L. had a medical appointment with Dr. Chen. Dr. Chen cleared E.L. – indicating nothing was wrong with him. Maira immediately contacted MONTOYA and advised her that E.L. had been cleared and asked her to please request the medical notes from the appointment.

85. Despite being notified regarding Kaiser's findings, CSW MONTOYA, failed to return E.L. to his parent's care and custody.

86. To the contrary, instead of immediately returning E.L. to his parents' care and custody and dismissing the Petition CSW MONTOYA authorized an extended unsupervised weekend visit for E.L. and his parents.

87. Despite request to do so, prior to the next hearing, the petition against the Lopez parents wasn't withdrawn and dismissed until two weeks later on July 10, 2024, nearly three months after competent medical opinion cleared the parents' of any wrongdoing on April 27, 2024.

## DAMAGES

88.   As a result of the LAMC Defendants and DHS social workers actions, and those of DOES 1 through 10, Plaintiffs suffered severe emotional distress, anxiety and general damage to their psyche, to such an extent as to cause physical manifestations of pain and symptoms of nausea and depression, including but not limited to sleeplessness, headaches, fatigue, malaise, irritability, inability to focus, a persistent generalized fear of authority figures and social workers, loss of appetite and loss of weight; Sam and Elizabeth now have an unassailable distrust of medical doctors and DHS personnel that may never fully resolve. Moreover, Sam, Elizabeth and E.L.'s siblings lost very significant bonding time with E.L.

89.   The incidents complained of above caused humiliation and embarrassment and loss of reputation in the community to Plaintiffs, has caused the incursion of attorney's fees and expenses, and a modicum of special damages in the form of the driving and parking for hospital visits with their child and trips to juvenile dependency Court, and child care for their other children at times in order to make their attendance at such events possible.

90.   Plaintiffs seek an award of exemplary (punitive) damages under federal law and to make an example of and punish defendants in the hope of deterring future conduct of a similar nature.

### FIRST CLAIM FOR RELIEF
*Violation of Civil Rights (42 U.S.C. § 1983)*
*Fourteenth Amendment*
COUNT 1
*Deprivation of Right to Familial Association*
(Sam & Elizabeth Lopez v. ALDACO, SANTIAGO, ROBERTS, HERNANDEZ, MONTOYA and DOES 1-10)

91.   Plaintiffs reallege, and incorporate herein as if set forth in full, paragraphs 1 through 87, as they relate to the actions of ALDACO, SANTIAGO, MONTOYA, ROBERTS, and HERNANDEZ, in continuing the detention of E.L. until July 10, 2024, after that point in time on April 27, 2024 when these defendants were informed that there was no physical abuse by the parents.

16

92. At all times relevant herein, the right to familial association guaranteed under the Fourteenth Amendments to the United States Constitution was so very "clearly established" that any reasonable social worker in Defendants' situation would know it is unlawful to continue to detain a child from the care, custody, and control of its parents when any basis for detention has been proven not to exist.

93. Furthermore, any reasonable social worker would know that to do so would constitute a violation of the parents', and children's, well elaborated Constitutional right to live together without governmental interference – which rights are protected under the Fourteenth Amendments to the United States Constitution.

94. Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize, acknowledge, and respect the Plaintiffs' rights, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate the rights guaranteed Plaintiffs under the United States Constitution, including, without limitation, the protection of parental rights, the right to privacy, family integrity and the right to familial relations.

95. At all relevant times alleged herein, Defendant agents of DHS, and each of them, were acting under color of state law when they acted to unlawfully continue the separation of E.L. from cohabitation and association with his siblings and Sam and Elizabeth.

96. The actions of Defendants SANTIAGO, ALDACO, MONTOYA, ROBERTS, and HERNANDEZ as alleged herein above, were undertaken with deliberate indifference to Sam and Elizabeth's rights, and/or with specific intention of harming Sam and Elizabeth.

97. Plaintiffs allege that based on the foregoing actions and failure to act, they are entitled to damages as specified in 88 through 90, above.

COUNT 2
*Deprivation of Constitutional Rights – Non-Consensual and Unwarranted*
*Forensic Medical Examination*
(Sam & Elizabeth Lopez, and E.L., v. the "Medical Team," and DOES 1-10)

98. Plaintiffs reallege, and incorporate herein as if set forth in full, paragraphs 1 through 87,

above as they relate to the actions of CHANG, VORA, PACHON, and LEON in conducting medical evaluations and treatments on the child E.L. without advanced notice and the opportunity to attend such evaluations and treatments given to the parents in violation of Sam and Elizabeth's Fourteenth Amendment rights of care, custody and control of E.L.

99. Defendants, and each of them, had, and have, an affirmative duty and obligation to recognize, acknowledge, and respect the Constitutional rights of Plaintiffs, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate their rights. These rights include, without limitation, the right to privacy, family integrity and the right to remain free of non-consensual unwarranted forensic medical examinations all arising under the Fourth and Fourteenth Amendments to the United States Constitution. Moreover, Defendants' employees and/or agents who, in their official capacity had supervisory and/or policy making authority, shared duties identical to those of their respective employers.

100. At all times relevant hereto, the Constitutional right to remain free of non-consensual intrusive forensic medical examinations was "clearly established" such that any reasonable person in Defendants' circumstances would know that it is a violation of the parents' constitutional rights to subject the child to a forensic medical examination without just cause, parental consent, or a court order/warrant authorizing the examination. *See Swartwood v. County of San Diego*, 84 F. Supp. 3d 1093, 1116-1117 (S.D. Cal. 2014) ["[T]he Constitution assures parents, in the absence of parental consent, physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances."] Barring a reasonable concern that material physical evidence might dissipate, or that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical

examinations. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. Cal. 2000).

101. Defendants Dr. CHANG, Dr. PACHON, and Dr. VORA, performed the forensic medical examination of E.L. at issue in this case. No one sought or obtained a warrant or other similar court order authorizing E.L.'s invasive forensic medical evaluations prior to the examination being conducted. At no point in time did Defendants, or anyone else, ever seek or obtain consent from E.L.'s parents to conduct an invasive forensic medical examination.

102. E.L. was subjected to invasive forensic medical examinations, including skeletal surveys, at KAISER without the consent, knowledge, or presence of either Plaintiff. These examinations were performed by Dr. CHANG, Dr. PACHON, and Dr. VORA and the KAISER Medical Team to develop the evidence needed to further allegations of abuse by DHS and CSW SANTIAGO which was included in her reports to the Juvenile Court.

103. Defendants Dr. CHANG , Dr. PACHON, and Dr. VORA and the KAISER Medical Team performed the forensic medical examination, a traditional government function, at issue in this case pursuant to contract, and at the behest of Kern County. There was no reasonable basis to conduct a forensic medical examination on E.L. when the injury to his skull was ruled an accident by law enforcement.

104. No reasonable agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting the warrantless forensic medical examination of E.L. under the circumstances then presented, was lawful.

105. Plaintiffs allege that based on the foregoing actions and failure to act, they are entitled to damages as specified in 88 through 90, above.

**SECOND CLAIM FOR RELIEF**
*Violation of Civil Rights (42 U.S.C. § 1983)*
*Fourth Amendment*
COUNT 1
*Unlawful Seizure*
(E.L. v. ALDACO, SANTIAGO, ROBERTS, HERNANDEZ, MONTOYA and DOES 1-10)

106. Plaintiffs reallege, and incorporate herein as if set forth in full, paragraphs 1 through 87, as they relate to the actions of ALDACO, SANTIAGO, MONTOYA, ROBERTS, and

19

HERNANDEZ, in continuing the seizure of E.L. until July 10, 2024, after that point in time on April 27, 2024 when these defendants were informed that there was no physical abuse by the parents.

107. Defendants had, and have, an affirmative duty and obligation to recognize, acknowledge, and respect the Constitutional rights of Plaintiffs, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate their rights. The Fourth Amendment to the United States Constitution safeguards the rights of children to be secure in their persons against unreasonable seizures.

108. Furthermore, any reasonable social worker would know it is unlawful to continue to seize a child from the care, custody, and control of its parents when any basis for seizure has been proven not to exist.

109. Defendants violated E.L.'s Fourth Amendment rights by their own affirmative conduct failing to disclose to the Juvenile Court exculpatory evidence that would have resulted in the immediate release of E.L. to the care and custody of the child's parents.

110. Plaintiffs allege that based on the foregoing actions and failure to act, they are entitled to damages as specified in 88 through 90, above.

COUNT 2
*Unlawful Seizure*
(E.L. v. the Medical Team and DOES 1-10)

111. Plaintiffs reallege, and incorporate herein as if set forth in full, paragraphs 1 through 87, as they relate to the unlawful seizure of E.L. and continued "hold" at Kaiser by LEON, CHANG, VORA, PACHON after it was determined there was no medical basis for continuing to detain the child; that date was March 24, 2024.

112. Medical practitioners violate the Fourth Amendment when they needlessly and unnecessarily confine a child under the false pretense of medical treatment without the consent of his parents and when there is no medically indicated need to continue the detention. To support a claim of unnecessary medical confinement, a plaintiff must show

that the medical facility and its agents acted under color of law by either performing a public function; engaging in joint action; acquiescing to governmental compulsion or coercion; or forming a governmental nexus. *See Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) [finding that agents acted under color of law if acting under the following theories: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus, and holding that satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists.]

113. Plaintiff alleges that LEON, CHANG, VORA, PACHON, acted as state actors under the public function and joint action theories.

114. Dr. CHANG colluded with the other members of the "medical team" and with DHS in a manner consistent with joint action to violate E.L.'s Fourth Amendment rights by acting to enact an unnecessary medical hold on E.L. to prevent his discharge to his parents while DHS was seeking a judicial warrant to detain E.L. so that the "medical team" might instead discharge E.L. to state custody.

115. Dr. CHANG colluded with the other members of the "medical team" and with DHS in a manner consistent with performing a public function to violate E.L.'s Fourth Amendment rights by providing E.L.'s confidential medical information to DHS agents, failing to provide the same information to E.L.'s parents.

116. Dr. VORA colluded with the other members of the "medical team" and with DHS in a manner consistent with joint action to violate E.L.'s Fourth Amendment rights by acting to enact an unnecessary medical hold on E.L. to prevent his discharge to his parents while DHS was seeking a judicial warrant to detain E.L. so that the "medical team" might instead discharge E.L. to state custody.

117. Dr. VORA colluded with the other members of the "medical team" and with DHS in a manner consistent with performing a public function to violate E.L.'s Fourth Amendment rights by providing E.L.'s confidential medical information to DHS agents, failing to provide the same information to E.L.'s parents.

21

118. Dr. PACHON colluded with the other members of the "medical team" and with DHS in a manner consistent with joint action to violate E.L.'s Fourth Amendment rights by acting to enact an unnecessary medical hold on E.L. to prevent his discharge to his parents while DHS was seeking a judicial warrant to detain E.L. so that the "medical team" might instead discharge E.L. to state custody.

119. Dr. PACHON colluded with the other members of the "medical team" and with DHS in a manner consistent with performing a public function to violate E.L.'s Fourth Amendment rights by providing E.L.'s confidential medical information to DHS agents, failing to provide the same information to E.L.'s parents.

120. Hospital social worker LEON colluded with the other members of the "medical team" and with DHS in a manner consistent with joint action to violate E.L.'s Fourth Amendment rights by acting to enact an unnecessary medical hold on E.L. to prevent his discharge to his parents while DHS was seeking a judicial warrant to detain E.L. so that the "medical team" might instead discharge E.L. to state custody.

121. Hospital social worker LEON colluded with the other members of the "medical team" and with DHS in a manner consistent with performing a public function to violate E.L.'s Fourth Amendment rights by providing E.L.'s confidential medical information to DHS agents, failing to provide the same information to E.L.'s parents.

122. Plaintiffs allege that based on the foregoing actions and failures to act, they are entitled to damages as specified in 88 through 90, above.

## Jury Trial Demand

Plaintiff demands a jury trial on each claim for relief set forth above.

## Prayer for Relief

WHEREFORE, Plaintiff prays for judgment against Defendants, as to all causes of action, as follows:

1. General damages and special damages according to proof;

2. As against the individual Defendants, punitive damages as allowed by law;

22

3.  Attorneys' fees pursuant to 42 U.S.C. 1988;

4.  Costs of suit incurred herein;

5.  Such further relief as the Court deems just and proper.

**POWELL & ASSOCIATES**

*/s/ Robert R. Powell*
**ROBERT POWELL**
**POWELL & ASSOCIATES**
Attorney for PLAINTIFFS
